IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RIGHTLINE, LLC,**<br>950 Falcon Drive<br>Malden, MO 63863<br><br>  Plaintiff,<br> v.<br><br>**FMC CORPORATION**,<br>2929 Walnut Street<br>Philadelphia, PA, 19104<br><br>  Defendant<br><br>**Serve On:**<br>CT Corporation System<br>1515 Market Street<br>Suite 1210<br>Philadelphia, PA 19102 | Civil Action No. |

## COMPLAINT

Rightline, LLC ("**Rightline**" or "**Plaintiff**"), by and through its undersigned counsel, respectfully files this Complaint against Defendant, FMC Corporation ("**FMC**" or "**Defendant**"), and in support thereof states as follows:

### INTRODUCTION

1. This lawsuit is brought to challenge an illegal plan implemented by chemical giant FMC to protect FMC's branded version of herbicide sulfentrazone from the generic versions that were introduced after FMC's patent expired in 2006. In addition, FMC illegally dumped product in the market below cost to further its goals of protecting its sulfentrazone products from generic competition.

2. FMC's illegal plan took the form of a sulfentrazone distributor loyalty program implemented at the large national distributors which awarded the distributors for making one hundred percent of their purchases of sulfentrazone from FMC.

3. The sulfentrazone loyalty program was successfully implemented and has for years blocked sellers of generic sulfentrazone from being able to sell to the large national distributors. The large national turf and ornamental distributors account for over eighty percent of the marketplace where herbicides and other pesticides are sold and are the overwhelmingly predominant distribution channel for the sale of sulfentrazone. As a result, end use consumers' (applicators) access was limited and prices paid were higher than they would have paid on similar generic alternatives.

4. Similar loyalty programs involving agricultural herbicides and pesticides have been the subject of a series of lawsuits brought by the Federal Trade Commission, multiple state attorneys general, and a host of private plaintiffs including direct and indirect purchaser class action lawsuits.

5. This case challenges a similar program involving a parallel marketplace, called the turf and ornamental market, which is dominated by similar multinational agricultural chemical companies but marketed and sold to landscape professionals and golf courses as opposed to growers of row crops.

6. Rightline is a diversified seller of turf and ornamental pesticides including sulfentrazone-based herbicide products. Because FMC attempted and in fact achieved a monopoly position for its Dismiss branded sulfentrazone through the implementation of its illegal loyalty program, Rightline has lost millions of dollars in sales and profits on existing product lines and has foregone product line expansion opportunities because of the market foreclosure.

7. Rightline seeks compensation for past damages from FMC as well as a permanent injunction enjoining FMC's continued illegal activities.

**PARTIES**

8. Plaintiff Rightline is a Missouri limited liability company with its principal office in Malden, Missouri. Rightline is an innovative seller of turf and lawn products, both generic and proprietary, and was founded in 2020 after the purchase by investors of certain assets of Generic

Crop Science ("GCS"). Upon its founding, Rightline immediately began to market and develop herbicide products that utilize the leading broad-spectrum herbicide sulfentrazone.

9.  FMC is a Delaware corporation with its principal office in Philadelphia, Pennsylvania. FMC is an agricultural sciences company that manufactures and distributes pesticides, herbicides, and fungicides for application on crops, flowers and turf.

## JURISDICTION AND VENUE

10.  Subject matter jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1337(a).

11.  This Court has personal jurisdiction over the Defendant because it has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 35(b).

12.  Venue is proper pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b) and (c) because FMC's principal of business is located in this Judicial District.

## STATEMENT OF FACTS

I.  **INDUSTRY BACKGROUND**

A.  **Sulfentrazone and the Turf and Ornamental Market**

13.  FMC developed and patented sulfentrazone, which was first introduced for sale in 1997, through its agricultural market brand name "Authority." In later years, sulfentrazone has been marketed for turf and ornamental purposes under the brand name Dismiss.

14.  Sulfentrazone is considered to be a broad-spectrum turf herbicide because it targets numerous sedges and certain broadleaf weeds such as spotted surge, chickweed, eclipta, bittercress, and morning glory. It is used widely in both warm and cool seasons.

15.  Sulfentrazone has attributes beyond the broad-spectrum of weeds it targets and kills. For example, sulfentrazone is rapidly effective, showing visible results on certain weeds within twenty-four to forty-eight hours, while other herbicides can take up to two to three weeks. Sulfentrazone also stays residual in the soil for up to sixty days, which means users of sulfentrazone will not need to reapply sulfentrazone as frequently as is required by other herbicides.

16. Sulfentrazone has no direct substitutes in terms of the breadth of targeted weeds, rapidity of effectiveness, nor in residual strength. It is the leading herbicide used by golf courses and other large owners of turf lawns, and even a ten percent or greater increase in the price of sulfentrazone would not induce sulfentrazone purchasers to shift their purchases to a different herbicide.

17. FMC's patent on Sulfentrazone expired in 2006 and is now available for purchase from numerous generic manufacturers. The expiration of the patent made it possible for others to manufacture and market their own sulfentrazone products. Several generic versions of sulfentrazone have been marketed in the United States since the expiration of the sulfentrazone patent.

18. Follow-on generic registrants have to either generate their own data to support such Environmental Protection Agency ("EPA") new generic registrations or offer to pay the original registration holder through federally encouraged data compensation mechanisms. *See* 7 U.S.C. § 135, et seq. Indeed, Rightline, through its predecessor-in-interest Generic Crop Sciences, paid significant data compensation to FMC to acquire its EPA technical and end-user registrations.

19. However, contrary to all expectations and the experience of the entry of generic products, none of the follow-on registrants had an appreciable inroad into FMC's market share despite FMC's dramatically high pricing. FMC was essentially receiving data compensation and compensation offers while at the same time creating marketing barriers for the same generic parties to enter the markets as described below.

**B. Generic Sulfentrazone and FMC's Loyalty Program**

18. Generic versions of sulfentrazone posed a significant threat to FMC's Dismiss sales as off-patent generic herbicides, fungicides and pesticides often sell for a fraction of the price at which brand name products are sold.

19. In order to thwart any inroad by generics into the sulfentrazone market, FMC implemented a loyalty program with large distributors which offered product discounts that the

distributor could only earn if it purchased one hundred percent of its sulfentrazone products from FMC. Any sulfentrazone purchase from any seller other than FMC forfeited the loyalty program payments for the distributor or even groups of distributors. As such, the gross margin percentage profitability of FMC sales of sulfentrazone into turf and ornamental markets was significantly higher than the sulfentrazone sales into agricultural markets where, upon information and belief, FMC did not implement these types of loyalty programs.

20. The FMC loyalty program was insidiously effective, as Rightline and other generic distributors have been generally limited to selling their generic sulfentrazone products only to small, non-FMC distributors.

21. Rightline's inability to sell generic sulfentrazone to the large distributors until recently occurred despite the fact that Rightline's product is chemically substantially similar to FMC's Dismiss and is a fraction of the price. Rightline's generic sulfentrazone has, for years, been blocked entirely from the primary channels of distribution as a result of the effectiveness of the FMC loyalty program, thereby significantly foreclosing its ability to compete, which had an obvious resultant harm to competition.

22. Rightline personnel have been repeatedly told by FMC distributors that the loyalty program terms were simply too lucrative for the distributor to risk purchasing product from Rightline or any other generic distributor. Thus, even though Rightline's generic sulfentrazone products are sold at a fraction of the price of FMC's branded sulfentrazone products, distributors were coerced not to purchase Rightline's or any other generic sulfentrazone product, and as such those distributors' customers' options to purchase sulfentrazone products were also limited. Generic producers of EPA regulated products constitute over thirty percent of the global pesticide industry, and the growth of generic manufacturers far exceeds that of companies owning or creating new products comprising patented active ingredients.

23. The fact that generic sulfentrazone has had a *de minimus* market share at major distributors is a shocking distortion of a competitive marketplace and it flies in the face of the regulatory scheme created the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), which created an eased regulatory environment for off-patent herbicides, fungicides, and pesticides to come on to the market with the express intention of providing faster price competition.

24. Specifically, FIFRA permits manufacturers of off-patent active ingredients such as sulfentrazone to rely on the same toxicology and environmental impact data as the original data generator (manufacturer) through a data compensation program for the data holders. The express purpose of this regulatory scheme is to ease the introduction in the market of substantially similar generic versions of regulated products no longer protected by a patent because competition with generics would inevitably result in lower prices to customers. Several generic suppliers of sulfentrazone have followed the FIFRA framework and paid data compensation to FMC (as the original data holder), which allowed the generic sulfentrazone to enter the U.S. market.

25. Despite the availability of generic sulfentrazone in the U.S., sulfentrazone sales to the large national distributors have not changed and the entirety of sulfentrazone sales to the national distributors (with one exception) has continued to be the branded FMC Dismiss version of sulfentrazone -- despite the significant price difference between Dismiss and its generic competitors. The difficulty that generic sulfentrazone has had in gaining traction in the market stands in marked contrast to the typical sales trajectory that occurs when a product subject to FIFRA regulation loses its patent status. The retention of FMC's high market share directly results from the loyalty program FMC created to force the sourced loyalty of their distribution partners.

26. FMC's loyalty program is a classic restraint of trade that has distorted the market for the sale of sulfentrazone in the market for nationally distributed turf products. The loyalty program has permitted FMC to continue to sell its sulfentrazone products at excessive premiums over what the generic versions are sold at, which has resulted in supracompetitive prices being charged to

customers of the major distributors. Generic suppliers such as Rightline have had to fight vigorously for the nominal marketspace left by the smallest non-FMC turf distributors.

27. The impact of FMC's loyalty program extends beyond blocking sales of sulfentrazone-only products. Sulfentrazone is sold both in sulfentrazone-only form and in what is called a "pre-mix" form, which is a blend of sulfentrazone and another herbicide product. Rightline sells a pre-mix of sulfentrazone and carfentrazone, which purchasers like because the combination attacks a broader spectrum of targeted growths with a single application. The loyalty program has also blocked Rightline's sales of the pre-mix because the pre-mix contains sulfentrazone.

28. Upon information and belief, FMC's loyalty program for sulfentrazone was also coupled with incentives paid for other active ingredients and products, the end result of which was to increase the value proposition of the sulfentrazone loyalty program as to leverage the same program to help FMC maintain distributors purchases of these other active ingredients.

29. FMC has an eighty to eighty-five percent market share of sulfentrazone products sold for use in the golf course and turf markets. But within the market of major distributors with the FMC loyalty program, FMC's market share has been over ninety-five percent. This is, by any definition, a monopoly, which has not been achieved as a result of superior skill, product innovation, or business acumen.  Rather, it is a result of FMC's illegal loyalty program.

    C. **National Distributors are A Stand-Alone Market Which FMC Has Restrained and Monopolized Through the Loyalty Program**

30. The distribution network for sulfentrazone and pre-mix products is made up of eight large national distributors, two major independent turf buying groups, and a smattering of smaller regional and local distributors. The large national distributors and the independent buying groups influenced by the FMC loyalty program are primary distribution channels for the sale of sulfentrazone products and account for over eighty-five percent of the total amount of sulfentrazone sold in the United States. Because of the unique characteristics of the way end-use customers who

patronize national distributors purchase their turf products, the market for selling sulfentrazone to the large national distributors is a distinct economic product market from the market for selling to the smaller local and regional distribution market.

31. FMC branded sulfentrazone is largely sold through the large national distributors of turf products, and FMC has successfully ensured its complete dominance of sulfentrazone sales at national distribution by offering a loyalty program to the distributors whose terms are so generous that all but one of the national distributors are unwilling to give up the benefits of the loyalty program by purchasing sulfentrazone from a supplier such as Rightline.

31. The sole exception to the embargo of generic sulfentrazone at the national distributors is at national agricultural product distributor Helena Agri, which decided a few years ago to develop and market its own generic form of sulfentrazone. Thus, the only exception to the effectiveness of the FMC loyalty program is a distributor that developed its own product. That only one distributor has decided to do so is a tribute to the insidious effectiveness of the FMC sulfentrazone loyalty program.

32. Under the terms of the loyalty program, distributors that agree only to purchase FMC's branded sulfentrazone and premixed products earn a large loyalty program rebate so long as the distributors (including distributor buying groups) do not buy *any* sulfentrazone from a generic provider.

33. As part of the loyalty program, FMC monitors the purchase and distribution of sulfentrazone products from its loyalty distributors through the monitoring of the distributors' sales data, which must be reported by distributors to FMC on a regular basis for program payments.

34. If any distributors are caught selling a generic sulfentrazone product, their loyalty contract may be cancelled and the distributor risks losing significant rebate revenue from FMC on sulfentrazone products, and possibly, other products. Individual members of distributor buying groups could put rebates at risk for other members of the buying group for breaking the loyalty

program parameters. The scale and scope of the large distributors is important to understanding why the large distributors choose not to put their FMC sulfentrazone rebates at risk by carrying generic versions. Specifically, the large distributors offer a comprehensive line of products and extensive local warehousing and quick product delivery.

35. One of the largest national distributors of turf products, is publicly traded, and its 2022 Annual Report filed with the SEC explains at pages 4-5 the way the national distribution market works and how it is a different economic market than the market for selling to the smaller local and regional distributors:

> As of January 1, 2023, this (unnamed) distributor had over 630 branch locations in 45 U.S. states and six Canadian provinces. Through our expansive North American network, we offer a comprehensive selection of approximately 155,000 stock keeping units ("SKUs") including irrigation supplies, fertilizer and control products (e.g., herbicides), hardscapes (including pavers, natural stone, and blocks), landscape accessories, nursery goods, outdoor lighting, and ice melt products to green industry professionals. We also provide value-added consultative services to complement our product offerings and to help our customers operate and grow their businesses.... Include[ing] assistance with irrigation network design, commercial project planning, generation of sales leads, business operations, and product support services, as well as a series of technical and business management seminars.... our broad product portfolio, convenient branch locations, and nationwide fleet of over 2,200 delivery vehicles position us well to meet the needs of our customers and ensure timely delivery of products. We source our products from over 5,000 suppliers….
>
> ****
>
> Over the past decade, professional landscape contractors have increasingly offered additional products and services to meet their customers' needs. These firms historically needed to make numerous trips to branches in various locations to source their products. Consequently, landscape professionals have come to value distribution partners who offer a larger variety of product categories and services, particularly given the recurring nature of landscape maintenance services.

36. FMC is acutely aware that sulfentrazone is but one product purchased by turf care professionals, among many. The convenience of national distribution means that customers of the national distributors do not need to make numerous trips to numerous places to get their products

and the customers can get quick delivery of products ordered as well as simplified and streamlined single-source billing.

37. FMC, upon information and belief, is well-aware that customers of national distributors are unlikely to search for sulfentrazone from other sources because the convenience factors of national distribution tend to outweigh the benefits customers perceive in searching for a particular product at a lower price elsewhere.

38. For customers of national distributors, there is more or less a lock-in effect when it comes to the purchase of a single product such as sulfentrazone.

39. The same lock-in effect is also present at the more medium-sized distributors that comprise the two large distributor buying groups as they offer much of the same scope of product mix and service.

40. Upon information and belief, FMC is also aware that the national distributors themselves and many of the medium sized distributors operate loyalty programs for their customers.

41. The large distributor's Annual Report referenced above further explains at page 8 that "[w]e offer a loyalty rewards program, our Partners Program, which had approximately 25,000 enrolled customers as of January 1, 2023 and provides business and personal rewards, access to business services at preferred rates, and technical training and support. Reward points may be utilized, for example, on credit on-account, trips and special events, gift cards to major retailers, and (the distributor's) courses and educational events. Access is also provided to preferred rate business services and includes, for example, payroll and select human resource services, cell phone services, office supplies, and fuel rebates. For the 2022 Fiscal Year, Partners Program participants accounted for approximately 52% of our Net sales."

42. Customers of national distributors are thus further disincentivized from searching for lower prices for sulfentrazone products by the distributor's own loyalty program. The FMC

loyalty program and the distributors' loyalty programs thus work hand in hand to keep Rightline out of the market for sulfentrazone sales to national distributors.

43. The fact that generic sulfentrazone can be purchased by turf professionals from the smaller local and regional distributors at a price less than 40% of the price of the FMC branded product has not been a sufficient price differential to cause turf professionals to seek generic sulfentrazone. The overall benefits to customers of the national distribution framework are too great to the customers to cause them to shift their product purchase sourcing for a single product, such as sulfentrazone, among the large cluster of products turf professionals purchase from the large national distributors.

44. Outside of the large, national distributors, there are numerous small, independent distributors scattered across the country. The small distributors handle much smaller markets and have limited distribution resources, when compared to the national distributors and the buying groups.

45. Customers who choose to purchase sulfentrazone from the smaller local and regional distributors give up the efficiency benefits offered by large national distributors.

46. By and large, the local and regional distributors do not have (i) web-based ordering and delivery coordination, (ii) nearby physical storefronts with significant inventories and a broad range of products, (iii) their own delivery trucks that can deliver directly to end users, and (iv) sufficient volume of business to purchase large quantities of product, significantly reducing shipping costs.

47. Because of the FMC sulfentrazone loyalty program, Rightline has only been able to sell to the smaller local and regional distributors, which represent less than twenty percent of total sales in the sulfentrazone market. Selling solely to the local and regional distributors carries with it sales volume and shipping inefficiencies in that the local and regional distributors do not typically purchase enough units of Rightline product to deliver it in pallet quantities. The small distributor

portion of the market has vigorous generic competition as all generic suppliers find themselves fighting for what FMC does not have bound per their loyalty agreements.

## II. THE IMPACT OF FMC'S UNLAWFUL CONDUCT

48. Rightline has directly encountered the anticompetitive effects of FMC's loyalty program for years in the form of running into an immovable brick wall in its effort to get its sulfentrazone products into major distributors. Rightline has been successful in selling non-sulfentrazone products to major distributors as it is only products that contain some portion of sulfentrazone which appear to be effectively barred by FMC's loyalty program.

49. Rightline personnel have explicitly been told by FMC distributors that if they purchased any amount of generic sulfentrazone products, they would lose the benefits of the loyalty program.

50. One distributor, not wishing to jeopardize its loyalty program benefits, went so far as to instruct Rightline to refrain from even discussing any sulfentrazone products with the distributor's field staff and regional managers.

51. Rightline has heard these stories from numerous customers over the years. One of the most explicit experiences involves a buying group comprised of small distributors. One of the small distributor members that did not itself have an FMC loyalty program was told by FMC to discontinue purchases of generic sulfentrazone or else every member of the buying group would lose their eligibility to receive loyalty program discounts. This is typical of FMC's coercive enforcement of the terms of its loyalty program to the detriment of Rightline and competition generally.

52. The exclusionary effect of the loyalty program extends beyond sulfentrazone itself, as sulfentrazone is often blended with other herbicides. For example, one product sold by FMC is a blend of sulfentrazone and carfentrazone marketed as Dismiss NXT. Rightline markets an identically blended product, yet the national distributors are precluded by FMC's loyalty program

from purchasing even that blended product. By extension, FMC has protected its off patent active ingredient carfentrazone by tying it into the sulfentrazone loyalty program as carfentrazone is predominantly sold premixed with sulfentrazone or other herbicides.

53. Further, the loyalty program even blocks sulfentrazone formulations FMC does not even offer. For example, Rightline has developed a unique dry mix version of sulfentrazone and metribuzin that is not offered by FMC. Rightline markets this dry mix as Sulfencore. Distributors who purchase this proprietary product from Rightline would nonetheless forfeit their sulfentrazone loyalty program benefits even though there is no similar FMC version. The loyalty program thus disincentivized innovation and reduces the choice of sulfentrazone forms available to the turf care professionals who purchase such products at national distribution since no Sulfencore was stocked at the distributors bound by the loyalty program.

### III. THE FTC'S LAWSUIT CHALLENGING SIMILAR LOYALTY PROGRAMS AGAINST SYNGENTA AND CORTEVA AND FMC'S SHIFT IN EXCLUSIONARY PRACTICES

54. In September 2022 the Federal Trade Commission filed an antitrust enforcement action against Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC (collectively, "Syngenta"), and Corteva, Inc. ("Corteva") for their anticompetitive practices in the agricultural industry related to their loyalty programs, which had the intended and actual effect of excluding generic products from the marketplace, harming competition and consumers. *See FTC, et al. v. Syngenta Crop Protection, AG, et al.*, 22-cv-828 (M.D.N.C.).

55. The loyalty programs challenged by the FTC are nearly identical to the program employed by FMC for sulfentrazone except that the programs apply to different agricultural pesticides manufactured by Syngenta and Corteva.

56. The lawsuit states that the loyalty programs were "expressly design[ed] to maintain [Defendants] ability to price [Defendants'] products above competitive levels while still retaining large market shares" and that the result of the loyalty programs was that Corteva and Syngenta

"enjoy[ed] outsize[d] profits during the 'post-patent' period—when prices would otherwise fall substantially." [FTC Complaint at ¶9] The lawsuit goes on to state that without the loyalty programs, the "Defendants would [have] face[d] increased generic competition which would lead to increased choice and lower prices for American farmers." [*Id.* at ¶11]

57. The FTC's challenge to agricultural pesticide loyalty programs obviously had some impact on FMC, as Rightline began receiving phone calls in January 2023 from major distributors informing Rightline that the distributors were now able to consider purchasing Rightline's sulfentrazone products because FMC had relaxed its loyalty program requirements from one hundred percent to ninety percent.

58. While a ninety percent loyalty program remains highly exclusionary and distortive of the competitive process, the speed with which certain distributors (including the largest national distributor) moved to make purchases from Rightline after FMC's program changes constitutes proof of the impregnable effectiveness of the prior one hundred percent loyalty program structure. The national distributors were not shutting out Rightline sulfentrazone due to some issue with Rightline's product – it was entirely about the FMC loyalty program.

59. However, the FTC's Syngenta/Corteva lawsuit did not cause FMC to abandon its pursuit of sulfentrazone dominance through improper anticompetitive means. It instead evolved its strategy to accomplish the same ends. Maintaining a ninety percent loyalty program was but a fig leaf because FMC was going to implement new programs that would create different ways to disincentivize national distributors from actually using the new flexibility allowed by the ninety percent loyalty program.

60. Specifically, FMC engaged in a campaign of below cost pricing through the implementation of a direct to customer rebate program which effectively ***paid*** customers to purchase FMC's sulfentrazone product.

61. FMC called the program its "Effortless Early Order Program" and it provided larger than ever direct to customer rebates for purchases made in October through December 2023.

62. The customer rebates for FMC's sulfentrazone products at times exceeded the price paid by distributors to FMC for the various FMC sulfentrazone product formulations. For instance, during the program period, a distributor could purchase FMC's Dismiss Herbicide 64 oz bottle at $172.00 per bottle. The distributor could then resell the bottle at $200.00 to an end-user, *e.g.*, a lawn care company. This end-user could then apply for and receive a $200.00 per bottle end user rebate directly from FMC through this "Effortless Early Order Program."

63. Not surprisingly, the program caused a stampede of customer purchases of FMC branded sulfentrazone, as sulfentrazone is shelf stable without risk of degradation for several years. Turf care professionals bought as much sulfentrazone as they could hold in inventory. Indeed, many customers purchased multiple years' worth of sulfentrazone.

35. There were no market circumstances that justified such predatory level pricing. There was no oversupply of FMC Dismiss sulfentrazone, and even if there were, there is an export market for sulfentrazone. There were no exigent circumstances that could have justified FMC's decision to "dump" Dismiss branded sulfentrazone into the U.S. market at or near net below cost prices. Indeed, upon information and belief, FMC had to produce additional Dismiss product after the program launch to cover increased shipment volumes generated by the below cost program.

36. This rebate program might favor end-use customers in the short term but its effect on competition is insidious over the longer term. The rebate program was a form of discipline meted out by a deep pocket company against its smaller generic competitors, including Rightline, to deprive them of revenue which could be used to invest in the sulfentrazone category including through innovation such as new sulfentrazone-based products.

37. The message sent by FMC was clear – stay away from sulfentrazone, because we [FMC] can wipe you out whenever and wherever we want to. In fact, this predictable result has

come to fruition. Rightline sells many other active ingredient herbicides and fungicides, and the uncertainty and instability created by FMC has caused Rightline to reassess its commitment to the sulfentrazone product market.

38. The result of FMC's anticompetitive behavior has been to sustain a monopoly position and supracompetitive pricing for years beyond the expiration of the sulfentrazone patent.

## CAUSES OF ACTION

### COUNT I: UNREASONABLE RESTRAINTS OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

39. The preceding paragraphs are realleged and incorporated as fully stated herein.

40. Each of FMC's loyalty program agreements with its distributors and distributor buying groups is a contract between the distributor and FMC, and such contracts constitute an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act.

WHEREFORE, Rightline prays for damages, trebled, attorneys' fees, costs, and any other such relief as supported by the law and the evidence.

### COUNT II: UNLAWFUL CONDITIONING OF PAYMENTS IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT (15 U.S.C. § 14)

41. The preceding paragraphs are realleged and incorporated as fully stated herein.

42. FMC, through the loyalty program, has provided payments in the form of rebates in the sale of sulfentrazone products on the condition that the distributors not use or deal in the sulfentrazone products of generic competitors, including Rightline.

43. This conditioning of payments substantially lessens competition and/or creates monopolies in the relevant market of sulfentrazone sales to large distributors. There is no meaningful economic or functional substitute to sulfentrazone given its broad spectrum, fast acting nature, and residual soil presence. Further, given the nature of distribution, the vast price difference between generic and branded sulfentrazone has not caused distributor customers to shop for generic

sulfentrazone from smaller distributors that do not provide the same cluster of convenience and services as is provided by national distributors.

WHEREFORE, Rightline prays for damages, trebled, attorneys' fees, costs, and any other such relief as supported by the law and the evidence.

### COUNT III: UNLAWFUL MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)

73. The preceding paragraphs are realleged and incorporated as fully stated herein.

74. At all relevant times, FMC had and willfully maintained monopoly power in the relevant market for the sale of sulfentrazone products to large distributors with a market share in the range of eighty-five percent.

75. FMC willfully maintained its monopoly power through an anticompetitive and exclusionary scheme that included the illegal loyalty programs and the enforcement of the terms thereof, as well as the disciplining mechanisms FMC implemented in the form of below cost product rebates.

76. FMC's conduct has resulted in an inexplicable near total monopoly in the main distribution channel on a product whose patent is long-expired. This near total monopoly has been severely injurious the generic suppliers of Sulfentrazone, has foreclosed competition for sale of sulfentrazone to end-users, and it has substantially reduced the incentive for generic manufacturers to invest in product innovation.

WHEREFORE, Rightline prays for damages, trebled, attorneys' fees, costs, and any other such relief as supported by the law and the evidence.

### PRAYER FOR RELIEF

Rightline prays for relief as follows:

(1) Rightline should be awarded damages in an amount proven at trial;

(2) Rightline should be awarded trebled damages consistent with the Sherman and Clayton Acts;

(3)     Rightline should be awarded its attorneys' fees and costs authorized by relevant law;

(4)     The Court should enter a permanent injunction precluding FMC from continuing the illegal conduct proven at trial; and

(5)     Any other relief that the Court deems appropriate and reasonable.

## JURY TRIAL DEMAND

Rightline demands a trial by jury on all issues so triable.

                                      Respectfully submitted,

                                      /s/Richard A. Barkasy
                                      Richard A. Barkasy, Esquire (PA Bar No. 53342)
                                      Whiteford, Taylor & Preston, L.L.C.
                                      600 North King Street
                                      Suite 300
                                      Wilmington, Delaware 19801
                                      (302) 353-4144
                                      rbarkasy@whitefordlaw.com

                                      *Attorneys for Plaintiff*

*Of Counsel for Plaintiff*

William F. Ryan, Jr. (*pro hac vice* forthcoming)
wryan@whitefordlaw.com
Steven E. Tiller (*pro hac vice* forthcoming)
stiller@whitefordlaw.com
Whiteford, Taylor & Preston, L.L.P.
Seven Saint Paul Street
Suite 1500
Baltimore, Maryland 21202-1636
(410)-347-8700

Patrick D. Houston (*pro hac vice* forthcoming)
phouston@whitefordlaw.com
Whiteford, Taylor & Preston, L.L.P.
Two James Center
1021 E. Cary, Suite 2001
Richmond, Virginia 23219
(804) 977-3300