IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RIGHTLINE, LLC,** | : CIVIL ACTION |
| | : |
| v. | : NO. 24-2726 |
| | : |
| **FMC CORPORATION** | : |

**MEMORANDUM OPINION**

Henry, J. s/CH                                                                                           May 30, 2025

      This is an antitrust case that focuses on an herbicide used mainly by golf courses called sulfentrazone. Defendant, FMC Corporation ("FMC"), developed and patented sulfentrazone and once its patent expired, Plaintiff, Rightline, LLC ("Rightline"), began marketing a generic version of sulfentrazone in 2020. Rightline alleges that to thwart generic competition, FMC created exclusive dealing arrangements with distributors whereby FMC provided distributors with significant rebates as long as they purchased all their sulfentrazone from FMC. Rightline alleges that by developing this loyalty program, FMC blocked generic suppliers from the marketplace and caused consumers to pay excessive prices. FMC moves to dismiss the complaint for failure to state a claim upon which relief can be granted. For the reasons that follow, I find that Rightline's Complaint states plausible claims for relief and I will therefore deny FMC's motion.

**I.    FACTUAL BACKGROUND**

      Sulfentrazone is the leading herbicide used by golf courses and other large owners of turf lawns. Compl. ¶ 16. FMC developed and patented sulfentrazone, introducing it for sale in 1997. *Id*. ¶13. Rightline's predecessor-in-interest paid FMC to acquire the right to rely on its data to

1

obtain its own EPA registration to sell generic sulfentrazone. Compl. ¶18. Rightline was founded in 2020 and began marketing generic sulfentrazone products. *Id.* at ¶8.

The relevant broad market is the sale of sulfentrazone and sulfentrazone-containing products to the large turf and ornamental market. Compl. ¶5. The primary distribution channels for sale of sulfentrazone products to the turf market are eight large national distributors and two independent distributor turf buying groups that account for over 85% of the sulfentrazone sold in the United States. *Id.* ¶ 30. Once its patent expired, FMC implemented exclusive dealing arrangements where it provided rebates to distributors in the primary distribution channel so long as they purchased all their sulfentrazone products from FMC. Rightline alleges that this action blocked generic suppliers from most of the marketplace and caused consumers to pay higher prices. *Id*. ¶¶2, 19, 26, 32.

FMC's rebate program also extended beyond its sulfentrazone-only product to other products that contained a blend of sulfentrazone and another herbicide product. *Id*. ¶27. FMC also allegedly monitored distributors' sales data and if any distributor was caught selling a generic product, FMC would cancel that distributor's ability to participate in its rebate program. *Id*. ¶¶33-34, 51. Rightline personnel were told by distributors that they would lose FMC's conditional rebate program if they purchased generic sulfentrazone. *Id*. ¶¶48-50.

In 2023, FMC slightly changed its purchase requirements for the rebate program, reducing the required amount of sulfentrazone to be purchased by distributors from 100% to 90%. *Id.* ¶57. During the Fall of 2023, FMC began a new rebate program where it paid end-users rebates for purchases that were more than the price that the distributors paid to FMC for the same product. *Id*. ¶¶61-62. Rightline alleges that this action resulted in many end-users buying

multiple years' worth of sulfentrazone from FMC, thereby depriving competitors of future sale opportunities. *Id*. ¶63.

Rightline claims that these actions by FMC violate the Sherman Act because they are unreasonable restraints of trade in violation of Sherman Act § 1 and unlawful monopolization in violation of Sherman Act § 2. 15 U.S.C. §§ 1-2. Rightline also claims violations of § 3 of the Clayton Act, unlawful conditioning of payments. 15 U.S.C. § 14. FMC moves for dismissal under Rule 12(b)(6), and for the reasons set forth more fully below, I find that Rightline plausibly stated claims upon which relief can be granted. Therefore, FMC's motion is denied.

## II.     LEGAL STANDARD

Motions to dismiss are governed by Federal Rule of Civil Procedure 12(b)(6).  If a plaintiff fails to state a claim upon which relief can be granted, the court may dismiss the action. Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Only a complaint that states a plausible claim for relief survives a motion to dismiss . . . . Threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." *Id.* at 678-79.  A claim satisfies the plausibility standard when the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Burtch v. Millberg Factors, Inc.*, 662 F.3d 212, 220-21 (3d Cir. 2011) (citing *Iqbal*, 556 U.S. at 678).

In *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016), the Third Circuit instructed district courts to apply a three-step analysis to 12(b)(6) motions: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify

allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." (quoting *Iqbal*, 556 U.S. at 675, 679).  See *Burtch*, 662 F.3d at 221; *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011); *Santiago v. Warminster Township*, 629 F.3d 121, 130 (3d Cir. 2010).

To establish an actionable antitrust violation, Rightline must show both that FMC "engaged in anticompetitive conduct" and that Rightline "suffered antitrust injury as a result." *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 (3d Cir. 2016). Further, if a plaintiff alleges violations of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act due to an exclusive dealing arrangement[1], as in the instant matter, a court must determine if it should apply the "price-cost test" or the "rule of reason" when analyzing that arrangement. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 268 (3d Cir. 2012). When a plaintiff's claim of exclusive dealing by a competitor is based predominately on the allegation that the mechanism of exclusion is pricing practices, the price-cost test applies. *Id.* But when a plaintiff's allegations of exclusive dealing are not centered on pricing practices alone, the "rule of reason" test applies. *Id.* at 271.

### III. ANALYSIS

In its Motion to Dismiss, FMC first argues that the "price-cost" test applies to Rightline's claims and serves to preclude all claims because FMC's prices are not below its costs. Docket No. 12, pp. 5-6. Next, it argues that even if the "price-cost" test does not apply, Rightline's

---

[1] "An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *ZF Meritor*, 696 F.3d at 270. "Exclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods." *Id.*, quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (O'Connor, J., concurring), abrogated on other grounds by *Ill. Tool Works Inc. v. Indep. Ink, Inc.,* 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006).

claims still must fail because Rightline has not alleged substantial foreclosure of the market or any anticompetitive effects to satisfy the "rule of reason." *Id*., p. 6. In response, Rightline asserts that the rule of reason applies to its allegations and not the price-cost test, and that it properly alleged an antitrust violation so that its claims must survive FMC's motion to dismiss.

      **A.**      **The Rule of Reason Test Applies to FMC's Alleged Antitrust Conduct**

First, I must decide whether to apply the price-cost test or the rule of reason in this matter. FMC argues that Rightline's claims of anticompetitive behavior set forth in the Complaint are based entirely on "allegations that FMC offered a loyalty rebate program to national distributors for a single product," and because Rightline's claims are based on allegations of a single product rebate program, pricing is the predominant means of exclusivity, and therefore, the price-cost test applies. Docket No. 12, pp. 6-7. FMC further argues that because Rightline has not alleged that FMC's prices are below cost, Rightline does not meet the price-cost test and its Complaint should be dismissed. *Id.*

In response, Rightline argues that its claims are not solely a challenge to FMC's pricing practices that would warrant application of the price-cost test. Docket No. 18, pp. 8-9. Rather, Rightline claims that its Complaint alleges "exclusive dealing, i.e., that Defendant excludes generics and maintains high pricing by imposing exclusivity conditions" on a substantial portion of the sulfentrazone market to foreclose generic rivals such as Rightline from an "opportunity to compete in the nation's primary and most cost-effective channel of distribution." *Id*., p. 9. Therefore, according to Rightline, as its claims are not based upon FMC's pricing practices but upon its alleged "exclusive dealing," the rule of reason should apply.

Viewing the allegations in the Complaint in the light most favorable to Rightline, I find that Rightline's Complaint plausibly pleads anticompetitive behavior, not merely competitive pricing. Accordingly, the rule of reason test should apply in this matter.

In *ZF Meritor*, the Third Circuit stated that the price-cost test was only to be used when "price is the clearly predominant mechanism of exclusion." Further, that same Court stated in *Eisai* that this is "usually the case when a firm uses a single-product loyalty discount or rebate to compete with similar products," as in that instance, "an equally efficient competitor can match the loyalty price and the firms can compete on the merits." *Eisai,* 821 F.3d at 409. By FMC's reading of the Complaint, the claims are "based entirely on Rightline's allegations that FMC offered a loyalty rebate program to national distributors for a single product-sulfentrazone." Docket No. 12, p. 7. Therefore, FMC argues, these are price-based claims, and the price-cost test must apply. In support of this single product allegation, FMC cites fifteen separate paragraphs of the Complaint that it plead only a single-product loyalty discount program. FMC relegates to a footnote what it claims are a few "conclusory allegations" that "vaguely suggest anything other than a single-product, price-based exclusion" in Rightline's Complaint. *Id*., p. 8, n. 4. However, a review of the Complaint shows that Rightline pled the following:

> 27. The impact of FMC's loyalty program extends beyond blocking sales of sulfentrazone-only products. Sulfentrazone is sold both in sulfentrazone-only form and in what is called a "pre-mix" form, which is a blend of sulfentrazone and another herbicide product. Rightline sells a pre-mix . . . [and t]he loyalty program has also blocked Rightline's sales of the pre-mix because the pre-mix contains sulfentrazone.

> 28. Upon information and belief, FMC's loyalty program for sulfentrazone was also coupled with incentives paid for other active ingredients and products, the end result of which was to increase the value proposition of the sulfentrazone loyalty program as to leverage the same program to help FMC maintain distributors purchases of these other active ingredients.

Compl. ¶¶27-28. In addition, paragraph 52 of the Complaint states that "sulfentrazone is often blended with other herbicides." *Id*., ¶52. A review of the allegations contained in these paragraphs shows that Rightline did not simply allege a single-product rebate program. Rather, the Complaint states that the loyalty program for sulfentrazone was "**coupled with** incentives paid for other active ingredients and products. . ." *Id*., ¶28 (emphasis added). Rightline's Complaint does not fall under the example of price being the predominant method of exclusion discussed in *Eisai,* as it does not allege a single-product rebate program.

      In addition, the Complaint stated as follows:

> 29. FMC has an eighty to eighty-five percent market share of sulfentrazone products sold for use in the golf course and turf markets. But within the market of major distributors with the FMC loyalty program, FMC's market share has been over ninety-five percent. This is, by any definition, a monopoly, which has not been achieved as a result of superior skill, product innovation, or business acumen. Rather, it is a result of FMC's illegal loyalty program.

Compl. ¶ 29. This paragraph of the Complaint shows that Rightline did not simply allege a price-based exclusion. Rather, this paragraph alleges that FMC has blocked Rightline's access to ninety-five percent of the major sulfentrazone distributors with its loyalty/rebate program, effectively blocking Rightline's access to the primary method of distribution of sulfentrazone and lessening its competition. Rightline's allegations comply with the language in *Eisai* that when "a dominant supplier enters into *de facto* exclusive dealing arrangements with every customer in the market, other firms may be driven out not because they cannot compete on a price basis, but because they are never given an opportunity to compete . . ." *Eisai* at 409 (citing to *ZF Meritor* at 281). Rightline's Complaint is not alleging that it is excluded from the market because of the **price** of FMC's sulfentrazone. Rather, it is alleging it is excluded from the market because it has not been given an opportunity to compete due to FMC's rebate program. These

allegations plainly set forth a plausible non-price-based exclusionary program, and the rule of reason test must therefore be applied.

> B. **Under the Rule of Reason, Rightline's Complaint Properly Pleads Antitrust Conduct**

The rule of reason test seeks to determine if an exclusivity arrangement will "foreclose on competition in such a substantial share of the relevant market so as to adversely affect competition." *ZF Meritor*, 696 F.3d at 271. There is no set formula for evaluating the legality of an exclusive dealing agreement, but there are numerous things courts can consider when completing the analysis. *Id.* In its Motion, FMC chooses to focus on only two issues: it alleges that Rightline's Complaint fails to "demonstrate either substantial foreclosure or likely or actual anticompetitive effects," and therefore fails the rule of reason test. Docket No. 12, p. 13. I will analyze both substantial foreclosure and anticompetitive effects in turn.

> 1. **Substantial Foreclosure**

"To demonstrate substantial foreclosure, a plaintiff 'must both define the relevant market and prove the degree of foreclosure,'" *Eisai, Inc.*, 821 F.3d at 403 (citation omitted), and claims that Rightline has failed to do either in its Complaint. As to FMC's argument regarding defining the relevant market, it is quite brief and argues only that Rightline's Complaint improperly limits the market in this case to "major distributors with the FMC loyalty program." Docket No. 12, p. 14. FMC argues that Rightline pled an "arbitrarily narrow market" for sulfentrazone by limiting it in such a fashion.

In reviewing Rightline's Complaint, I find that Rightline has properly defined the relevant market. Here, the Complaint identifies the relevant market as the sale of sulfentrazone and sulfentrazone-containing products to the turf and ornamental market involving golf courses and landscape professionals. Compl. ¶ 5. Further, the Complaint goes on to set forth that within

this market, there is a primary national distribution channel that accounts for 80% to 85% of sulfentrazone sales in the United States. Compl., ¶ 30. This is enough to plead the extent of the relevant market at the pleadings stage, as the Third Circuit has recognized that, absent some obvious oversight in the pleadings, "courts are cautious before dismissing for failure to define a relevant market." *Mayor & City Council of Baltimore v. Merck Sharp & Dohme Corp.*, No. CV 23-828, 2023 WL 8018980, at *8 (E.D. Pa. Nov. 20, 2023), quoting *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018); see also *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.")

Moving on to FMC's argument that Rightline failed to allege any degree of foreclosure of the market so as to harm competition, I note that "there is no fixed percentage at which foreclosure becomes 'substantial.'" *Eisai*, 821 F.3d at 403. Moreover, "'total foreclosure' of the market is not required for an exclusive dealing arrangement to be unlawful. *ZF Meritor*, 696 F.3d at 283, quoting *Dentsply*, 399 F.3d at 191. Rather, the challenged practices must "bar a substantial number of rivals or severely restrict the market's ambit," thereby substantially lessening competition. *Eisai*, 821 F.3d at 403.

FMC first argues that the Complaint contains inconsistent facts and percentages regarding FMC's alleged market share, and that lacking any consistency as to FMC's market share, the Complaint cannot allege **any** degree of foreclosure in the relevant market. However, the Complaint states that "FMC has an eighty to eighty-five percent market share of the sulfentrazone products for use in the golf course and turf markets," which is the overall broad market. Compl. ¶ 29. The Complaint further states that FMC's market share of the primary

9

national distribution channel is "over ninety-five percent." Compl. ¶29. Accordingly, Rightline has plainly and consistently alleged FMC's market share in its Complaint.

Next, FMC argues that the Complaint merely alleges that Rightline was unable to successfully compete in the market, and therefore cannot set forth any degree of foreclosure. I find this contention to be incorrect, as the Complaint states that FMC's exclusive dealing arrangements have blocked Rightline and other generic suppliers from selling their products in the distribution channel that accounts for 85% of sales in the relevant market. Compl., ¶¶ 21, 30. FMC's alleged practices clearly present a severe restriction of the extent of the market available to generic manufacturers, which in turn presents a plausible substantial foreclosure and lessening of competition. As the question of whether "alleged exclusive dealing arrangements foreclose a substantial share of the line of commerce is a merits question not proper for the pleading stage," *In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*, No. 12-711, 2013 WL 812143, at *19 (D.N.J. Mar. 5, 2013), I find Rightline has sufficiently pled substantial foreclosure of the market.

### 2. Anticompetitive effects

Next, FMC argues that Rightline makes no allegations concerning the likely or actual anticompetitive effects of FMC's rebate program. To establish anticompetitive effects, a plaintiff must allege facts showing "reduced output, increased price or reduced quality in goods or services." *Eisai*, 821 F.3d at 403. A review of the Complaint shows the following allegations:

> 3. The sulfentrazone loyalty program has for years blocked sellers of generic sulfentrazone from being able to sell to the large national distributors. . . As a result end user consumers' (applicators) access was limited and prices paid were higher than they would have paid on similar generic alternatives.
>
> 6. . . . Rightline has lost millions of dollars in sales and profits on existing product lines and has foregone product line expansion opportunities because of the market foreclosure.

> 26. . . . The loyalty program has permitted FMC to continue to sell its sulfentrazone products at excessive premiums over what the generic versions are sold at, which has resulted in supracompetitive prices being charged to customers of the major distributors. . .

Compl., ¶¶ 3, 6, 26. These allegations clearly allege plausible anticompetitive effects, and FMC's argument to the contrary must fail.[2]

### III.     CONCLUSION

For the reasons discussed more fully above, Defendant's Motion is denied. An appropriate Order will follow.

---

[2] FMC's Motion and Memorandum of Law in support both state that Rightline is unable to establish an antitrust injury. Docket No. 12, pp. 1, 13. However, FMC fails to set forth any further argument on this issue. Assuming FMC intended to argue that Rightline failed to plead an antitrust injury, I find that the Complaint in this matter sufficiently sets forth the types of injuries that antitrust law is intended to prevent, and this argument also must fail.